## Walsh *v.* Pittsburgh (et al., Appellant).

Argued September 29, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

230

*James J. Burns, Jr.,* with him *Tom P. Monteverde,* for appellant.

*Edward A. Schultz,* with him *Seif, Schultz & Frost,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, Nov. 8, 1954:

On July 7, 1950, the Pavia Company (in this Opinion to be referred to as Pavia), a contracting corporation, engaged with the Commonwealth of Pennsylvania to make certain excavations on Beechwood Boulevard in the City of Pittsburgh for the purpose of placing beneath the highway a 20″ high pressure water pipe. In the performance of this work, Pavia dug or permitted to develop in the excavation process, a trench about 15 feet long, 4 feet wide and from one foot to 4 feet deep at a point where Beechwood Boulevard intersects with Alger Street and Greenfield Avenue. These three converging streets are all public highways which accommodate considerable metropolitan traffic.

On the night of April 22, 1951, at about 10 o'clock, the plaintiff Evelyn Walsh was riding over Beechwood Boulevard in an automobile being driven by a Joseph Gannon. When the car reached the intersection above described, it fell into the hole at that point and as a consequence the plaintiff suffered serious injuries. Evelyn Walsh sued the City of Pittsburgh in trespass, the City brought in the owner of the car, Oline Gan-

non, the driver of the car, Joseph Gannon, and the Pavia Company as additional defendants. At the ensuing trial the court granted a nonsuit in favor of the City of Pittsburgh and the jury exonerated Oline Gannon and Joseph Gannon, but brought in a verdict of $4,000 in favor of the plaintiff against Pavia. Pavia moved for judgment n.o.v., the motion was refused and the case is before us on appeal.

The learned trial court properly refused judgment n.o.v. Whoever digs a pit in the middle of a busy street and fails to properly barricade it in, cannot complain if he falls into it himself by being held responsible in money damages to those who are injured through his imprudence.

Pavia complains on appeal that it met its obligations toward the public by placing a wooden "horse" beside the trench, by using flares, and by employing a watchman. These defences could have been completely exculpatory if they were supported by fact, but the record fails to show any substance behind their formidable facades.

1. The Wooden Horse.

It was testified that on the evening of the accident Pavia had placed a single wooden horse at the "far end of the ditch toward Alger Street." The trench, however, was subject to contact from *three* sides. Obviously the guarding of only one prong of a three-pronged danger cannot absolve the protector from liability for resulting injuries. The horse was a frail, thin planking affair about 3 feet high with a 3 inch lettering. Two hours before the Gannon car appeared on the scene, a Buick car, apparently because of the poor lighting at this point as will be discussed later, struck the horse and the motorist threw it away. A barricade to be effective must be constructed of such

material that it will by size, weight and conspicuousness offer visual and reasonable resistance to the elements and to fortuitous invasion. A contractor who erects a barrier of feathers around a dangerous crater cannot defend so ephemeral a protection on the ground that he had no reason to expect a high wind.

On this phase of the case Pavia leans heavily on the case of *Braden v. Pittsburgh*, 143 Pa. Superior Ct. 427, because, there also, the barricade had been removed by a third agency. However, with this one parallelism, resemblance to the case at bar ends. In the *Braden* case the girl plaintiff was injured when, after she had left the completed portion of steps connecting different levels of a street, she stepped into a hole in one of the earth steps cut into the hillside and fell. A barrier placed there by the City of Pittsburgh had been removed by some unknown person. The Superior Court said: "The city's failure to anticipate that the safeguard might be removed was not negligence in itself, in the absence of circumstances indicating the probability that it would be removed." (p. 433)

In the case at bar, however, the so-called barricade consisted only of a light-weight planking and was so placed in the very center of the stream of boulevard traffic that its being dislodged from its place of rest can hardly be said to have been so unforseeable that it should not have been guarded against. Also, it is to be particularly noted that in the *Braden* case, the Court said: (p. 433) "The probable danger and the element of risk to a pedestrian involved in descending the hill have some bearing upon the degree of care required of the city and the frequency of inspection required to see to it that the barrier was in place. . . *The danger therefore was not immediate as in the case*

*of the* failure to safeguard an open ditch in a sidewalk." (Emphasis supplied)

The court then, almost as if to make certain that the *Braden* case would not serve as a precedent in a fact situation as the one we have before us, said: (pp. 433-34) "The case, also, is not comparable in the degree of care required, with the one involving a repair of a *known dangerous defect* in the cartway of a highway open to traffic. Here, the stairway had been closed for several weeks with a barrier marked 'travel at your own risk.' *It was entirely outside of the traveled portion of any highway."* (Emphasis supplied)

The *Braden* case involved isolated, rarely-travelled steps on a hillside. Here the *locus in quo* was a highly travelled boulevard where the flow of traffic at the point in question was estimated to be 25 to 30 cars per hour.

Pavia also contends that the act of the motorist who struck the wooden horse and tossed it aside was an independent agency thus saving it from liability for any negligence it may have committed. But the rule contended for by Pavia is only applicable where the intervening act of the third party was not to be anticipated and cannot be related to the act committed by the defendant. This principle of law was made quite clear in the very case cited by Pavia,—*Kosson v. West Penn Power Co.,* 293 Pa. 131. In that case a boy was killed and another seriously injured when they stepped on a large stone which tilted under them and caused them to slide down a hillside against a heavily charged transformer owned by the defendant company. Pavia argues that the action of the Buick motorist here was an intervening agency as the tilting of the stone in the *Kosson* case was an intervening agency. The analogy is forced, artificial and insupportable. Pavia could

reasonably anticipate, because of the lack of lighting at the involved intersection, and the persistent driving rain, as well as the heavy traffic, that some motorist would strike the flimsy darkened barrier, but the West Penn Power Company in the *Kosson* case could not reasonably foresee that boys would approach the fatal transformer. This Court said in that case: (pp. 134-5) "The transformer was protected by a high fence on three sides and by a ledge of rocks and precipitous bank on the other. The boys did not reach the trans-- former from the side but by falling from above. *The bank was so rugged and inaccessibly steep that the possibility of any one climbing up there and falling into the transformer was beyond human foresight. Such an occurrence could not reasonably have been foreseen or guarded against.* . . . The failure to more securely guard the transformer was not the proximate cause of the accident, but it was the slipping or tilting of the flat stone under the weight of the boys which threw them down the bank and onto the wires. The lack of a guard was at most only a remote condition. The tilting of the stone, with which defendant was in no manner connected, was an independent intervening cause. Except for that the accident would never have occurred. Hence, under the law, this must be treated as its efficient cause. *Had the fall resulted from lack of a fence, a different question would be presented.*" (Emphasis supplied)

In the *Kosson* case the accident would not have occurred if the stone had not tilted, but in the case at bar the Gannon car would in all probability still have fallen into the trench even if the Buick motorist had not removed the horse. When Pavia placed so anemic a barricade at the dangerous trench it did not meet the burden of due care imposed on it by the law.

2. The Flares.

Pavia's watchman testified that each evening about 6 o'clock he placed kerosene flares near the trench. But were they lighted? The presence of flares that are not burning is as much protection against danger as the waving at night at a railroad crossing of an unlit lantern. Wm. H. Raymer, attendant at a gasoline sta' tion located across the street from the trench, testified that on April 22, 1951, a heavy rain had fallen all day and that at the time of the accident the flares were dark. One who creates a dangerous condition on the highway and then ostensibly plants flares against nocturnal mishap does not absolve himself of responsibility unless he exercises some reasonable foresight as to weather possibilities and mechanical defects as well. It is futile for Pavia to speak of warning flares which lacked illumination. Raymer testified that after the accident he and the motorist Gannon tried to light the wicks of the flares but they would not catch fire because they were sodden with rain. A high wind also contributed to the non-inflammability of the wicks.

Nor did the street light at the corner supply adequate illumination for immediate detection of the danger in the street. Raymer testified that the trees in the vicinity curtained the environment in such a manner that little if any of the beams from the street lamps touched the outer edges of the trench.

It is common knowledge, also, that an intense rain, especially in combination with the obscurity of night, will carpet the surface of the ground with shadows that conceal irregularities, depressions and cavities. Thus, Mrs. Rena Talbot, witness for the plaintiff, testified that after the accident she could only see the hole in the pavement by standing over it and looking directly into it.

### 3. The Watchman.

Pavia employed a watchman, Paul Dentice, who apparently watched only when he was not needed. He left at 6 P.M. just as the vanguard of danger appeared and returned at 8 in the morning when daylight itself took up the burden of warning motorists of the perils at the intersection of Beechwood Boulevard, Alger Street and Greenfield Avenue. After leaving his flares and wooden horse at 6 P.M., Dentice did not return at any time of the night to check as to whether they were able to serve the purposes for which they were there presumably posted.

Sections 113a and 114a of the contract entered into between Pavia and the Commonwealth of Pennsylvania provided: "BARRICADES, DANGER, WARNING AND DETOUR SIGNS. The contractor shall furnish, erect and maintain at closures, intersections and throughout the project, all necessary standard of approved barricades, suitable and sufficient red lights, torches, approved reflectors, danger signals, warning and closure signs; provide a sufficient number of watchmen and take all necessary and legal precautions for the protection of the work and safety of the public, as designated in Section 1.4.5 of these specifications. All barricades, danger signals, warning signs and obstructions shall be illuminated at night and all lights shall be kept burning from sunset until sunrise, and for such other periods of time when the barricades. danger signals, warning signals, and obstructions are not clearly visible in natural light. Detour signs will be furnished and placed by the Department."

A reading of the transcript of the trial would indicate that, so far as the Beechwood trench was concerned, Pavia had scored a complete zero in living up to the safety precautions it had contracted to observe.

In any event, the jury was justified from the testimony in concluding that Pavia's negligence was established beyond all dispute or question.

The law applicable to a case of this kind requires but little elaboration. As far back as 1898 this Court said in the case of *Beck v. Hood,* 185 Pa. 32, 40: "It would not be enough for a builder to fence off a part of the walk, because it was in a dangerous condition, and then give it no more attention. He knows the probabilities of the removal of the barrier by mischievous or disorderly persons, and he should exercise reasonable care to see that it is in place. It might not be necessary to maintain a watchman at the spot during the night, but the builder should give some attention to this subject during the evening, and while the walks are actively occupied, in order to be sure that the lights and barriers he has provided to protect the public are in place and doing their work. How well this had been done in this case was for the jury. The pole was certainly down, according to the plaintiff's testimony, when he came upon this part of the walk, although it had been found in place but a few moments before."

In that case, the protective barrier had been seen a few moments before the accident occurred but this Court nonetheless held that responsibility on the part of the defendant had attached. With what greater reason would liability follow in the present case where the barrier had been removed two hours prior to the accident and the defendant was aware, for a period of three months, of the dangers attendant upon the depressed *situs in quo*?

It is interesting to note also in the *Beck* case that there was an electric light on the street a little more than a hundred feet away from the obstruction. "There was another," the Court pointed out, "at Oxford Street

or near the other end of the row of houses, and there was a gas burner about midway between them upon the other side of the street. There were red lights also displayed within a few feet of the block of stone at the curb." The Court then summed it all up by saying that "whether there was light sufficient to enable one exercising ordinary care to see where he was going, or warnings sufficient in the red lights at the curb to attract his attention," were questions entirely for the jury.

In *Yuhasz v. Pitt Construction Co.*, 305 Pa. 166, we clearly laid down the standard of care required where streets have been made dangerous because of excavations: "In our opinion the record presents no reversible error. It was the defendant's duty to guard the trench by reasonable barriers. Considering the nature of the excavation, its proximity to where pedestrians are compelled to walk, the amount of travel there and all the circumstances, whether it performed that duty was for the jury."

Judgment affirmed.